## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Terry Utech as trustee for the heirs and next-of-kin of Sandra Ann Utech, deceased,<br><br>        Plaintiff,<br><br>v.<br><br>Gaither Bynum, Jr., MD; Connie Johnson Schaeffer, RN; and Stevens Community Medical Center,<br><br>        Defendants. | Civil No. 07-4712 (DWF/RLE)<br><br><br><br>**MEMORANDUM OPINION AND ORDER** |

---

Chad William Schulze, Esq., Milavetz Gallop & Milavetz, counsel for Plaintiff.

Richard J. Thomas, Esq., and Bryon G. Ascheman, Esq., Burke & Thomas PLLP, counsel for Defendant Bynum.

David D. Alsop, Esq., and Lynn Schmidt Walters, Esq., Gislason & Hunter LLP – Mpls, counsel for Defendants Johnson Schaeffer and Stevens Community Medical Center.

---

### INTRODUCTION

This matter is before the Court upon the Motion to Dismiss for Lack of Jurisdiction and Motion for Partial Summary Judgment brought by Gaither Bynum, Jr., MD ("Dr. Bynum") and the Second Amended Motion to Dismiss brought by Connie

Johnson Schaeffer, RN ("Johnson Schaeffer")[1] and Stevens Community Medical Center ("SCMC," and together with Dr. Bynum and Johnson Schaeffer, "Defendants").

Plaintiff has asserted claims under the federal Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, against SCMC.[2] Plaintiff also has alleged state law claims for negligent care, treatment, and wrongful death against all three defendants and for negligent credentialing against SCMC. For the reasons set forth below, the Court grants the Defendants' motions as to Plaintiff's EMTALA claims.[3]

## BACKGROUND

Plaintiff was the husband of Sandra Ann Utech ("Utech"), who is deceased. The night before she died, Utech was brought to SCMC by ambulance suffering respiratory distress, chest pain, and right arm pain. She received medical treatment from Dr. Bynum and Johnson Schaeffer while at SCMC. Utech underwent a physical examination and was given a number of tests and treatments, including a gastrointestinal ("GI") cocktail, cardiac enzyme tests and an arterial blood gas test, an electrocardiogram ("EKG"), and a chest x-ray. Dr. Bynum diagnosed Utech with anxiety/depression syndrome with multiple life stressors and hyperventilation. Dr. Bynum also noted chronic pain in

---

[1] Johnson Schaeffer's name is spelled differently in various documents before the Court. The Court uses the spelling adopted by the Plaintiff in the Complaint.

[2] Plaintiff originally asserted his EMTALA claim against Dr. Bynum and Johnson Schaeffer as well, but has stipulated to dismissal of the EMTALA claim against these individuals.

[3] The Court does not address the Plaintiff's other claims and, therefore, does not rule on any additional issues raised in the Defendants' motions.

Utech's right shoulder and arm pain with associated numbness, which he thought was related to her cervical spine.  Dr. Bynum also believed Utech was suffering from gastritis.

Utech had a family history of cardiac problems.  According to Dr. Bynum, he advised Utech that he could not definitively rule out a cardiac problem as the cause of her symptoms and recommended that she be admitted to stay overnight.[4]  According to both Dr. Bynum and Johnson Schaeffer, Utech declined to be admitted and was discharged.  Kim Bouressa ("Bouressa") picked Utech up from the hospital.  Utech went to Bouressa's house to spend the night and was found dead there in the morning.  An autopsy determined that Utech died from bilateral pulmonary edema and congestion, likely due to congestive heart failure, and underlying coronary artery disease.

## DISCUSSION

The Court must first determine whether Plaintiff has stated a claim under EMTALA.  If so, this Court has subject-matter jurisdiction because the Plaintiff has presented a federal question and the Court may consider Plaintiff's state-law claims pursuant to its supplemental jurisdiction.  28 U.S.C § 1367(a) (providing that "the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution").  If not, then

---

[4]  Dr. Bynum testified that he made this recommendation but it does not appear in his notes. Johnson Schaeffer testified at her deposition that she had written a nursing note stating Utech "was offered to stay in the hospital overnight if she did not want to go home and would feel more comfortable staying to be observed overnight." (Doc. No. 44 ¶ XI, Doc. No. 48 Ex. J at 95.)

Plaintiff's EMTALA claim must be dismissed and the Court may decline to hear the remaining claims asserted under state law. 28 U.S.C. § 1367(c)(3).

## I. Standard of Review

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996). However, as the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enter. Bank*, 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials but must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

**II.     EMTALA Claim**

EMTALA was intended to address "a distinct and rather narrow problem-the 'dumping' of uninsured, underinsured, or indigent patients by hospitals who did not want to treat them." *Summers v. Baptist Med. Ctr. Arkadelphia*, 91 F.3d 1132, 1136 (8th Cir. 1996); *Cleland v. Bronson Health Care Group, Inc.*, 917 F.2d 266, 268 (6th Cir. 1990) (noting that enactment of EMTALA followed "highly publicized incidents" in which hospital emergency rooms allegedly failed to provide a medical screening or transferred or discharged patients based only on a patient's "financial inadequacy"). EMTALA provides that:

> [i]n the case of a hospital that has a hospital emergency department, if any individual (whether or not eligible for benefits under this subchapter) comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition (within the meaning of subsection (e)(1) of this section) exists.

42. U.S.C. § 1395dd(a). The "appropriate medical screening" requirement has been interpreted to require a hospital to provide a medical examination consistent with that offered to other similarly situated patients. *Summers*, 91 F.3d at 1138 ("[a]n inappropriate screening examination is one that has a disparate impact on the plaintiff").

If an individual is determined to have an emergency medical condition, the hospital must either provide "such further medical examination and such treatment as may be required to stabilize the medical condition," or must transfer the individual to another medical facility after the emergency medical condition has been stabilized. 42

5

U.S.C. § 1395dd(b)(1) and (c). EMTALA requires a hospital to stabilize the patient, but it does not require the hospital to cure the patient's condition. *Green v. Touro Infirmary*, 992 F.2d 537, 539 (5th Cir. 1993) (holding that no EMTALA violation occurred when patient left hospital with normal vital signs, was ambulatory, and was not in acute distress). The hospital's responsibility under EMTALA ends when the patient is stabilized. *Id*. Further, hospitals are not liable under EMTALA for failing to stabilize conditions of which they are unaware or even of which they should have been aware. *Kenning v. St. Paul Fire & Marine Ins. Co.*, 990 F. Supp. 1104, 1110 (W.D. Ark. 1997) (quoting *Vickers v. Nash Gen. Hosp., Inc.*, 78 F.3d 139, 145 (4th Cir. 1996)); *Summers*, 91 F.3d at 1140 (stating that a hospital must have actual knowledge of the patient's unstabilized emergency medical condition to show an EMTALA claim). To hold otherwise would make an EMTALA claim the equivalent of a malpractice claim for negligent treatment. *Kenning*, 990 F. Supp. at 1110.

Courts have made clear that EMTALA is not a federal malpractice statute, and claims of misdiagnosis or inadequate treatment are not actionable under EMTALA. *Summers*, 91 F.3d at 1136; *see also Hunt v. Lincoln County Mem. Hosp.*, 317 F.3d 891 (8th Cir. 2003) (holding no EMTALA claim existed where patient's condition was undetected during medical screening). Therefore, EMTALA does not entitle patients to correct or non-negligent treatment, but instead only requires that they receive uniform treatment. *Summers*, 91 F.3d at 1138.

SCMC argues that Dr. Bynum did not perceive Utech to be suffering from an emergency medical condition. The record is unclear as to this issue. At the time he

examined Utech, Dr. Bynum did not clearly identify that Utech was undergoing a cardiac event and diagnosed her with other conditions. At his deposition, however, when read EMTALA's definition of "emergency medical condition," Dr. Bynum stated that he thought that Utech had an emergency medical condition when she arrived at the emergency room. (Doc. No. 57 ¶ 3, Ex. 3 at 148.) Dr. Bynum's statement at his deposition was general; he did not identify any particular condition he believed Utech had. At this stage of the case, the Court must view the evidence in the light most favorable to the Plaintiff. Though the evidence is not overwhelming, the Court determines that there is sufficient evidence in the record to show that Dr. Bynum believed Utech was suffering from some sort of emergency medical condition at the time she arrived at SCMC. SCMC, therefore, had an obligation under the statute to stabilize Utech's condition before discharging or transferring her.

     Dr. Bynum testified in his deposition that, at the time Utech was discharged, her condition was stable; he stated that Utech's tests were negative and all of her vital signs were unremarkable or "did not seem to be threatening." (*Id*. Ex. 3 at 147.) Dr. Bynum did not believe that there would be any material deterioration in Utech's condition. (*Id*. Ex. 3 at 149.) Dr. Bynum also testified that SCMC did not have the equipment necessary to do additional tests, other than the ones Utech had been given, to diagnose a cardiac condition. (Doc. No. 44 ¶ XII, Doc. No. 48 Ex. K at 160-61.) If Dr. Bynum had determined it was necessary for her to see a cardiologist for a consultation, he would have been required to send her to another facility. (Doc. No. 57 ¶ 3, Ex. 3 at 168.)

Nonetheless, Dr. Bynum recommended to Utech that she stay overnight to undergo re-testing because he thought it possible that she had a cardiac condition not identified by the tests she had been given.[5] During the testing, Dr. Bynum had identified a "right bundle branch block," and he explained to her that she had "some abnormalities, but they weren't ischemic." (*Id*. Ex. 3 at 138.) Dr. Bynum testified that he asked Utech to remain in the hospital, but that she declined to do so.[6] (*Id*. Ex. 3 at 138.) Johnson Schaeffer's notes reflect that Utech stated she preferred to go home and sit in her rocking chair. (Doc. No. 44 ¶ XI, Doc. No. 48 Ex. J at 95.)

Plaintiff argues that there is a genuine issue of material fact as to whether SCMC knew that Utech was suffering from an unstabilized emergency medical condition. First, Plaintiff contends that Dr. Bynum knew that Utech was suffering from symptoms associated with cardiac disease, that her family history put her at risk of cardiac disease, and that she was a smoker. Therefore, according to Plaintiff, because Dr. Bynum had knowledge of her symptoms and risk, there is an issue of facts as to whether Dr. Bynum knew that Utech had an emergency medical condition. Further, Plaintiff argues that his expert, Dr. David R. Peterson, identifies numerous signs that Utech presented with a cardiovascular problem and that she should have been admitted for treatment rather than being discharged. (Doc. No. 57 ¶ 3, Ex. 9.) In essence, however, Plaintiff's arguments

---

[5] Dr. Bynum wanted to give Utech additional blood tests and monitor her heart further. (Doc. No. 57 ¶ 3, Ex. 3 at 145.)

[6] The Court notes that a hospital meets EMTALA's stabilization requirement if treatment is offered to a patient along with information about risks and benefits and the patient refuses additional treatment. 42 U.S.C. § 1395dd(b)(2).

8

are that Dr. Bynum *should have known* that Utech had an emergency medical condition. The record before this Court, even viewed in the light most favorable to the Plaintiff, does not show that Dr. Bynum had actual knowledge of an unstabilized emergency medical condition at the time Utech was discharged .

Dr. Bynum did not diagnose Utech with cardiac disease and did not identify that she was having a cardiac event at the emergency room. Dr. Bynum thought that there could be a cardiac cause for her symptoms, but believed that Utech was stable, based on her negative tests and vital signs, at the time she was discharged. Viewing the record in the light most favorable to the Plaintiff, Dr. Bynum failed to determine that Utech was suffering from an unstabilized emergency medical condition. The failure to determine that a patient has an emergency medical condition may be the basis for a medical malpractice claim, but does not create a claim under EMTALA. *See Kenning,* 990 F. Supp. at 1109 (stating that "EMTALA is not concerned with the standard of care or with a misdiagnosis").

Plaintiff also provided the deposition testimony of Bouressa regarding a conversation she had with Utech when she picked Utech up from SCMC. According to Bouressa, while they were in the car, Utech stated that she believed she was having a heart attack. (Doc. No. 57 ¶ 3, Ex. 4 at 30.) Bouressa questioned why Utech was leaving the hospital and linked the discharge to Utech's lack of insurance. (*Id*. Ex. 4 at 30-31.) Bouressa's deposition testimony on this point is somewhat lacking because the majority of the information was supplied by the attorney taking the deposition. Nevertheless, Bouressa testified that, when Bouressa asked Utech why she was not in the hospital,

9

Utech stated "I do not have insurance." (*Id*. Ex. 4 at 30.) According to Bouressa's deposition:

> Q: You said, "Is it a question of your paying the bill?" and she said, "No, I can pay the bill." Is that - -
>
> A. Yes.
>
> Q. Is that what you're understanding her to say?
>
> A. Yes.
>
> Q. But you're concluding that the hospital said it was anxiety because they didn't do what they should have done to find out of it was a heart attack? Is that what you're understanding?
>
> A. Yes. Yes.
>
> Q. All right. So [Utech] thought they were doing the care on the cheap?
>
> A. Yes.
>
> Q. So they didn't do the tests they needed to do to figure it out?
>
> A. Yes.
>
> Q. That's what you understand this to mean?
>
> A. Yes.

(*Id*. Ex. 4 at 31). Bouressa also testified that she suggested that Utech go back in to SCMC or be taken to Alexandria or St. Cloud, Minnesota, so that she could be seen at other hospitals. (*Id*., Ex. 4 at 32, 36-37.) According to Bouressa, Utech refused to return to SCMC or to go to another hospital, and Utech extracted a promise from Bouressa that Bouressa would not make Utech go to see any "quacks." (*Id*.)

Leaving aside the question of whether Bouressa's testimony as to her understanding of Utech's subjective belief would be admissible at trial, and viewing this evidence in the light most favorable to the Plaintiff, the Court will assume that Utech believed that she was discharged because she lacked insurance. Evidence of improper motivation is not essential to an EMTALA claim. *Summers*, 91 F.3d 1137-38. Evidence of disparate treatment, however, is required. Plaintiff has not shown that Utech received treatment different from that which SCMC offered to other patients. It is the Plaintiff's burden to show disparate treatment. *Williams v. Birkeness*, 34 F.3d 695, 697 (8th Cir. 1994) (stating that is not the hospital's obligation to disprove a plaintiff's claim by showing that all patients are treated uniformly).

The Court, therefore, must dismiss Plaintiff's EMTALA claim. This claim is the basis for federal jurisdiction in this case, and the Court may decline to exercise jurisdiction over Plaintiff's remaining state law claims. Most often, when federal and state claims are joined and the federal claims are dismissed on a motion for summary judgment, courts dismiss the remaining state-law claims without prejudice in order to avoid making needless decisions of state law, as a matter of comity, and to promote justice between the parties. *Ivy v. Kimbrough*, 115 F.3d 550, 552-53 (8th Cir. 1997). The Court declines to exercise jurisdiction over Plaintiff's remaining claims. The Court, therefore, dismisses these claims without prejudice so that they may be heard by a Minnesota state court.

## CONCLUSION

The Court concludes that Plaintiff has not shown that Utech received disparate treatment at SCMC and, therefore, that Plaintiff's EMTALA claim fails. The Court dismisses Plaintiff's EMTALA claim with prejudice. The Court also declines to exercise its supplemental jurisdiction and dismisses, without prejudice, Plaintiff's pendant state-law claims against the Defendants.

Accordingly, **IT IS HEREBY ORDERED** that:

1. The Motion to Dismiss for Lack of Jurisdiction and Motion for Partial Summary Judgment of Defendant Gaither Bynum, Jr. (Doc. No. 35) is **GRANTED.**

2. The Second Amended Motion to Dismiss of Defendant Connie Johnson Schaeffer (Doc. No. 41) is **GRANTED IN PART** and **DENIED IN PART** as follows:

    a. Defendant Johnson Schaeffer's motion is **GRANTED** as to Plaintiff's EMTALA claim;

    b. Defendant Johnson Schaeffer's motion is **DENIED AS MOOT** with respect to Plaintiff's other claims.

3. The Complaint (Doc. No. 1) is **DISMISSED** as follows:

    a. Count 2 of the Complaint alleging violation of EMTALA is **DISMISSED WITH PREJUDICE** and summary judgment is **GRANTED** to SCMC regarding Count 2.

      b. Counts 1 and 3 of the Complaint are **DISMISSED WITHOUT PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: December 17, 2008        s/Donovan W. Frank
                                                         DONOVAN W. FRANK
                                                         Judge of United States District Court